IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 09-00207  DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RODNEY D. KING, and          [01] | ) | |
| SHARON-MAE NISHIMURA [02] | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE AND STATEMENTS

In a hearing on February 8, 2010, and a continued hearing on

February 11, 2010, the Court heard Defendant King's Motion.  Edward G. Caspar,

Esq., and Darren W. K. Ching, Assistant U.S. Attorney, appeared at the hearings

on behalf of the Government; Matthew C. Winter, Assistant Federal Public

Defender, appeared at the hearings on behalf of Defendant.  After the hearings on

the motion and reviewing the supporting and opposing memoranda, the Court

**DENIES** Defendant's Motion.

BACKGROUND

The Court repeats the background facts only as is necessary for a

decision on Defendant Rodney King's Motion to Suppress Evidence and

Statements ("Mot.," Doc. # 52) in the discussion section below.  At the suppression

hearing on February 8, 2010 ("hearing") and the continued hearing on February 11,

2010 ("continued hearing"), the Government presented evidence establishing the

facts that follow.

On May 9, 2008, at about 9:40 p.m., FBI agents lead by Special Agent

Mary Itnyre, having previously obtained an arrest warrant for Rodney King

("Defendant") for his violation of supervised release, located Defendant near the

elevators in the lobby of the Aqua Hotels and Resorts, Island Colony Hotel in

Honolulu.  Special Agent Rachel Byrd testified that the agents identified

themselves and ordered Defendant to lie on the ground.  Defendant complied.

Agents placed Defendant under arrest, cuffed Defendant's hands behind his back,

and led him to the adjoining parking structure where Defendant and agents had

parked their cars.  Defendant was searched after he was placed in handcuffs.

Special Agent Itnyre testified that she requested to search Defendant's

car, the keys having been found on next to Defendant's person during arrest.

Defendant refused, telling the agent to "get a warrant," and requested that the

agents release his car to Sharon-Mae Nishimura ("Nishimura"), who was staying

with him at the hotel in room 2420.  Defendant wanted his car removed from the

premises and asked the agents to deliver the car keys to Nishimura in the hotel

2

room.   Special Agent Itnyre testified that in addition to Defendant's statement that Nishimura was in the hotel room, she had also received information confirming Nishimura presence.

Five agents, lead by Special Agent Itnyre, returned to the hotel with Defendant's car keys intending to contact Nishimura.  Two agents remained with Defendant in the parking structure.  The instant Motion concerns several pieces of evidence agents found in room 2420 and believed to be related to Defendant's alleged sex trafficking enterprise.

On May 20, 2009, a federal grand jury returned a six-count indictment against Defendant and co-defendant Nishimura.  (Doc. # 1.)  On September 23, 2009, the Government filed a superseding indictment charging Defendant with 13 counts including: (Counts 1-4, 9-10) sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a), (b); (Counts 5-6) sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a), (b) and 1594(a) and 2; (Counts 7-8) sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a), (b); (Counts 11-12) sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a)(2), 1591(b)(2), and 3559(e); and (Count 13) conspiracy to engage in sex trafficking, in violation of 18 U.S.C. § 1591.  (Doc. # 35.)  On September 30, 2009, Defendant entered a plea of not guilty.  (Doc. # 44.)

3

On December 21, 2009, Defendant filed the instant Motion to
Suppress Evidence and Statements.  (Doc. # 52.)  On January 14, 2010, the
Government filed a second superseding indictment charging defendant with Counts
1-4 and 7-12, in violation of 18 U.S.C. § 1591, Counts 5-6, in violation of 18
U.S.C. §§ 1594, 1591; and Count 13, in violation of 18 U.S.C. § 371.  (Doc.
# 64.)  On January 15, 2010, Defendant entered a plea of not guilty.  (Doc. # 70.)
On January 25, 2010, the Government filed a Response to Defendant's motion.
("Resp.," Doc. # 83.)  On January 29, 2010, Defendant filed a Reply.  (Doc. # 90.)

<u>DISCUSSION</u>

Defendant moves to suppress evidence obtained inside room 2420
where Defendant had stayed prior to his arrest.  In support, Defendant argues that
at the time of this search, he retained a reasonable expectation of privacy in the
room, Government agents lacked a warrant, and no exceptions to the warrant
requirement applied.  (Mot. at 1-2.)  Defendant further argues that his statements to
Government agents should be suppressed because they were involuntary and
coercively obtained.  (<u>Id.</u> at 2) Additionally, Defendant moves to suppress evidence
obtained from a search of a laptop computer, three thumb drives, and a memory
stick because the Government agents' warrant to search these items was allegedly

4

made ineffective because the search failed to comport with the Fourth Amendment.

(Id.)

I.      Entry and Search of the Hotel Room

Pursuant to the Fourth Amendment, all state-initiated searches and

seizures must be reasonable and must generally require a warrant in order to be

valid.  United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).  The Fourth

Amendment ensures:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   However, there are several established exceptions to the

warrant requirement of the Fourth Amendment.  Hawkins, 249 F.3d at 872.   The

burden of proof rests on the government to justify a search under one of the

exceptions to the warrant requirement.  Id.  If the government fails to meet this

burden, the exclusionary rule generally prohibits the introduction of the evidence at

trial.  See Elkins v. United States, 364 U.S. 206, 221-22 (1960).  Illegally obtained

evidence and all evidence derived from the illegally seized evidence must be

excluded.  Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States

v. Patzer, 277 F.3d 1080, 1086 (9th Cir. 2002).

A.      Defendant's Expectation of Privacy in the Hotel Room

To show the Government has violated his Fourth Amendment rights, an individual must have "a legitimate expectation of privacy in the invaded place." United States v. Crawford, 323 F.3d 700, 706 (quotation marks and citations omitted).  It is the defendant's burden to establish that he has a reasonable expectation of privacy in the place searched.  See United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004).  It is the government's burden to establish that a warrantless search of a place in which a defendant has a reasonable expectation of privacy was reasonable.  See United States v. Carbajal, 956 F.2d 924, 930 (9th Cir. 1992).  In order to show a legitimate expectation of privacy, a defendant must demonstrate, under the totality of the circumstances, "a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable."  United States v. Sarkisian, 197 F.3d 966, 986 (9th Cir. 1999).

Fourth Amendment protection extends to such places as hotel or motel rooms.  Bautista, 362 F.3d at 589 (citing United States v. Cormier, 220 F.3d 1103, 1108-1109 (9th Cir. 2000)).  With regard to a rented hotel room, the Ninth Circuit has recognized that "[p]art of what a person purchases when he leases a hotel room is privacy for one's person and one's things."  United States v. Young, 573 F.3d

6

711, 716 (9th Cir. 2009) (citing <u>United States v. Dorais</u>, 241 F.3d 1124, 1128 (9th

Cir. 2001)).  A hotel guest's reasonable expectation of privacy may be

extinguished by either the expiration of the rental period or by its lawful

termination, <u>i.e.</u>, justified eviction.  <u>See</u> <u>Bautista</u>, 362 F.3d at 589-90 ("[U]nless [a

hotel guest's] occupancy ha[s] been lawfully terminated when the police conducted

their search, [the guest] retain[s] a reasonable expectation of privacy in the

room[.]") (citation omitted).   In <u>Young</u>, the Ninth Circuit clarified that the arrest

of a hotel guest alone does not lawfully terminate the rental period or otherwise

extinguish the guest's reasonable expectation of privacy in his hotel room.  <u>Young</u>,

573 F.3d at 716 ("Being arrested is different from being evicted, and being arrested

does not automatically destroy that person's reasonable expectation of privacy in

his home.").  The parties do not dispute that Defendant intended to check-out of the

hotel on May 10, 2008, the day after his arrest.

When Special Agent Itnyre and the other four agents returned to the

hotel in order to provide Nishimura with Defendant's car keys, Special Agent

Itnyre was met by Tama Sauta ("Sauta"), the hotel's night shift Supervisor of

Security.  Sauta testified that a previous security guard on duty had witnessed

Defendant's arrest and relayed this information to Sauta along with Defendant's

room information and the fact that Defendant was now in FBI custody in the

7

parking garage.  Sauta informed Special Agent Itnyre that it was hotel policy to immediately evict any hotel guest physically arrested by law enforcement and that Defendant was evicted automatically due to his arrest.  Sauta further testified that as per policy, Defendant had been evicted even prior to Sauta's conversation with the FBI and that the hotel had already planned to evict the room's contents and any remaining occupants.  Sauta asked the agents to assist him with completing the room's eviction of Defendant's belongings and any other individuals associated with his room.  At this time, Special Agent Itnyre testified that her only intention in going to room 2420 was to deliver the car keys to Nishimura and to attempt to talk with her.  Once assistance was requested of her by the hotel, Itnyre also agreed to help complete the eviction of the room's belongings and occupants.  Itnyre stated that she had no intention of searching the room and was not prepared to do so with either equipment or an operational plan.

Agent Itnyre and Sauta both testified that Sauta accompanied agents to room 2420.  Sauta testified that the agents had requested his presence because they intended to talk with someone in the room.  Sauta stated that upon reaching the room, he knocked on the door and identified himself as hotel security.[1]  When

---

[1]The Court notes that the testimony of Sauta and Itnyre revealed discrepancies that required findings of fact on the part of the Court.  The Court has

(continued...)

there was no answer, Special Agent Itnyre knocked on the door and identified the

FBI and requested that Nishimura come to the door.  As stated above, the agents

had knowledge of Nishimura's presence in the room.  No one in the room

responded to Itnyre's first request.  Special Agent Itnyre repeated the knock and

announce procedure without any response from inside.[2]  Sauta testified that the

agents asked him if there was a way to get inside the room and in response he went

down to the lobby and retrieved a passcard in order to let the agents into the room.

Sauta also testified that he reiterated to the agents that he wanted their assistance in

evicting the room, and provided the agents with a key to the room so that they

could assist the hotel.

        The agents knocked again, and when no one responded, they used the

key to open the door.  Special Agent Itnyre testified that for officer security

reasons, Sauta stayed behind the agents and outside of the doorway as the agents

---

[1](...continued)
resolved these discrepancies in favor of Sauta.  After hearing the testimony, the
Court believes Special Agent Itnyre to be credible and truthful, but to have
forgotten or mis-remembered some of the details from the night of the arrest with
respect to who knocked on the room door first.

[2] Defendant argues that if the agents were "simply . . . assisting the security
guard's eviction of the room's occupants . . ., compliance with the knock-and-
announce rule was not required.  The Court notes that the fact that procedure is not
required, does not mean that it is prohibited from use or that its use is necessarily
indicative of the fact that it was required.

entered the room as the agents knew that Nishimura was in the room and they also had information that Defendant possessed a gun.

Special Agent Itnyre testified that room 2420 consisted of a living room and kitchen area, a hallway, a bathroom, and a separate bedroom.  When agents entered the room, they conducted a "protective sweep" described by Special Agent Itnyre as a "slow, methodical clear" to ensure their safety from anyone who may have been present in the room.  Agents cleared all areas of the room before proceeding to the bedroom where they found Nishimura apparently lying on the bed.  The agents handcuffed Nishimura and cleared the bedroom.  Special Agent Itnyre testified that she attempted to interview Nishimura but she was described as very emotional, visibly upset at Defendant King's arrest and the agents' interference, and uncooperative.  At this time, Sauta again asked the agents to clear the room of all belongings and occupants.

Defendant argues that his occupancy of the hotel room was not lawfully terminated when the agents entered and searched the room.  (Mot. at 9.) In support, Defendant states that hotel management, not a security guard, must terminate a guest's occupancy in order for termination to be lawful.  Defendant cites Young for the proposition that whether "a hotel guest retains a reasonable expectation of privacy in his room turns on 'whether the management had

10

justifiably terminated [the patron's] control of the room through private acts of dominion.'" Young, 573 F.3d at 716 (quoting Bautista, 362 F.3d at 590) (emphasis added)).[3]

Defendant also argues that it is not clear that the hotel's policy to evict hotel guests who have been caught engaging in illegal activity in the hotel or have been arrested for engaging in such activity in the hotel applied in this matter.[4] See id. at 717 (noting a the hotel's policy at issue in Young stated that "guests suspected of committing a crime in the hotel should be evicted from the hotel"). Defendant asserts that he was arrested for a warrant issued for a supervised release violation in an unrelated criminal matter, and therefore unrelated to Defendant's

---

[3] Defendant cites to an unpublished decision as support for the proposition that a security guard lacks managerial authority. See Izquierdo v. Circus Circus Casinos, Inc., 2008 WL 763224 (D. Nev. Mar. 19, 2008) (unpublished). Izquierdo analyzed managerial authority in the context of Nevada law specifically regarding punitive damages—a standard that is inapplicable in this case. Id. at *2. Further, the court emphasized that the security guard's duties were subject to established policies significantly different from the ones at issue in the instant case. Id.

[4] Defendant apparently contests that there was a hotel policy mandating eviction but does not further support this assertion. (Mot. at 11.) Defendant's arguments regarding the hotel policy were made prior to the Government's submission of the hotel eviction policy and uncontradicted testimony of Sauta's supervisor, Irving Eastman, Director of Security and Risk Management at the Island Colony Hotel regarding both the eviction policy and Sauta's authority of management to enforce the policy. Defendant does not elaborate on these argument in his Reply brief.

occupancy of a room in the hotel.  (See Mot. at 10-11.); see Young, 573 F.3d at 717–718.  Further, Defendant argues that the hotel's policy was never disclosed to him.  Young, 573 F.3d at 717–718 ("[A] hotel's confidential policy or [a] manager's suspicions, not disclosed to the defendant, cannot destroy an otherwise reasonable expectation of privacy.") (citing Rakas v. Illinois, 439 U.S. 128, 143–144 & n.12 (1978)).

In opposition, the Government states that the written policy of the hotel explicitly required that "violation of a criminal statute [and] physical arrest by Law Enforcement personnel . . . will all result in immediate eviction[,]" leaving no room for security personnel to exercise discretion in Defendant's eviction.  (See Resp., Ex. 1 at 25.)  The Government argues that Sauta was the hotel supervisor on duty at the time of the arrest and that he had the authority to evict occupants pursuant to the hotel policy without seeking approval from any other hotel staff member or manager.  (Resp. at 13.)  Sauta's supervisor, Irving Eastman, Director of Security and Risk Management at the Island Colony Hotel, confirmed in his testimony that Sauta had complete authority to evict Defendant and any other occupants of Room 2420 without consultation with any other hotel employee and that in Defendant's case, eviction was "automatic" upon his arrest once that arrest was made known to the hotel.

In the instant case, the hotel policy at issue differs significantly from the unwritten policy that the court found insufficient in <u>Young</u> to terminate a guest's reasonable expectation of privacy.  <u>See</u> <u>Young</u>, 573 F.3d at 717 (noting that the hotel's unwritten policy provided "that guests suspected of committing a crime <u>in the hotel</u> should be evicted from the hotel") (emphasis added). Defendant's citation to <u>Young</u>, for the proposition that "[A] hotel's confidential policy or [a] manager's suspicions, not disclosed to the defendant, cannot destroy an otherwise reasonable expectation of privacy[,]" is inapposite.  <u>Young</u>, 573 F.3d at 717–718 (citing <u>Rakas v. Illinois</u>, 439 U.S. 128, 143–144 & n.12 (1978)).  Here, the hotel's policy was written and the plain language required immediate eviction.  (Resp., Ex. 1 at 25.); <u>see</u> <u>Young</u>, 573 F.3d at 717–718. Here, the hotel policy explicitly provided:

> [V]iolation of a criminal statute, <u>physical arrest by Law Enforcement personnel</u>, criminal activity that threatens the safety and security of the [hotel], and violation of hotel policies and procedures <u>will all result in immediate eviction</u>.

(Resp., Ex. 1 at 25 (emphasis added).)  Unlike trespass warnings, provided for in the hotel policy, which require approval by the director of Security and/or the Hotel Manager on duty, the policy mandated that certain explicitly listed actions would "all result in immediate eviction" with no discretion on the part of a hotel

13

employee once that employee had sufficient cause to believe a condition for eviction was present. (Id.) The eviction mandate, which is part of a non-confidential, written hotel policy provides a hotel employee faced with a situation requiring eviction the authority of management in carrying out such an eviction. This information was confirmed by Eastman, who testified that if a hotel guest was arrested and hotel security guard or staff member was notified, eviction was automatic and failure to evict was a terminable offense for the employee.

Further, according to the plain language of the policy, such physical arrest was not limited to arrest for "criminal activity that threatens the safety and security" of the hotel. (Id.) Eastman confirmed that as Director of Security and Risk Management, he directs how hotel policy is implemented, and that any arrest by a hotel guest qualified for eviction, whether it pertained to the security of the hotel or not. Defendant does not argue that management's issuance of a policy giving a security guard, in effect, the authority of management would be ineffective to cause Defendant's eviction.

Sauta testified that a previous security guard had informed him of Defendant's arrest and detention by the FBI, which certainly falls under the eviction mandate of "physical arrest by Law Enforcement personnel." Sauta informed Special Agent Itnyre of the hotel policy as the reason for Defendant's

14

eviction and asked for her assistance in completing the eviction of the room.

Therefore, Sauta had the authority of management in evicting Defendant pursuant

to the hotel's written policy.[5]

        Defendant next argues that Sauta's decision to evict Defendant did not

constitute a lawful termination of his occupancy of the hotel room because hotel

management took no affirmative steps to repossess the room, and therefore,

Defendant was still in possession of the room when the agents entered and

searched the room.  See Bautista, 362 F.3d at 590 (citing United States v.

Henderson, 241 F.3d 638, 647 (9th Cir. 2001)).

        A hotel guest's reasonable expectation of privacy in a room is

extinguished when a hotel takes "justifiable affirmative steps to repossess [a] room

. . . and to assert dominion and control over it."  United States v. Cunag, 386 F.3d

888, 895 (9th Cir. 2004); see United States v. Haddad, 558 F.2d 968, 975 (9th Cir.

1977) ("Appellant had no reasonable expectation of privacy with respect to a room

from which he had been justifiably ejected. . . . Once ejected for good cause, the

_____

        [5] The Court notes that Young and Bautista courts' discussion of managerial
authority to evict a hotel guest did not include analysis regarding whether a non-
managerial hotel employee could be bestowed such authority or whether a hotel
policy could provide such authority.  See Young, 573 F.3d 711; Bautista, 362 F.3d
584.  Further, Young referenced a hotel staff member's ability to evict a hotel
guest.  See Young, 573 F.3d at 716-17; see also United States v. Dorais, 241 F.3d
1124, 1127-28 (9th Cir. 2001).

room reverted to the control of the management, and the former occupant had no continuing right to privacy in the room.").

Defendant, citing Young, contends that neither Nishimura nor himself were ever told by any member of the hotel's staff that he had been evicted.  (Mot. at 12.)  Further, Defendant states that there is no indication that the keys to the room had been confiscated by hotel staff, or if they were computer activated passcards, that they had been rendered inoperable and that there is no evidence that Defendant was removed from the registered guest list at the hotel at the time of the search.  (Id.)  In opposition, the Government argues that the hotel took "justifiable and affirmative steps" to repossess his room after hotel security personnel witnessed Defendant's physical arrest in the hotel lobby.  (Resp. at 13.)

Here, Security Guard Sauta had the authority to evict Defendant and took justifiable affirmative steps to do so with the help of law enforcement prior to the agents' entry to the room.  See United States v. Dorais, 241 F.3d 1124, 1127-28 (9th Cir. 2001); Cunag, 386 F.3d at 895-896.  Based on Sauta's testimony, the Court finds the following affirmative steps were made by the hotel in repossessing its room from Defendant prior to agents' entry to the room: hotel security witnessed Defendant's arrest; Sauta was informed of that arrest and knew that hotel policy automatically evicted Defendant, his belongings, and any occupants from

16

the room; knowing that Defendant was in custody and could not return to the room,

the hotel planned to remove any belongings or occupants left in the room; Sauta

informed the FBI agents holding Defendant that Defendant had been automatically

evicted pursuant to hotel policy; Sauta requested agent assistance in completing

eviction of the room of all persons and belongings; Sauta accompanied the agents

to the room in which Defendant had stayed; Sauta knocked on the door and

announced he was hotel security; Sauta retrieved the hotel passkey so that agents

could enter the room; and Sauta stayed with the agents in the hallway outside the

room while the agents knocked on the door, provided the agents with the key card

that opened the door, and intended to stay by the room in order to assure that the

room and its contents were cleared of people and belongings.

       In fact, after agents' entry, Sauta continued to wait outside while the

agents entered the room to secure it, repeated his request for agent assistance in

completing the eviction multiple times, informed Nishimura that she, too, was

being evicted and neither she nor her belongings could stay in the room, waited by

the room as Nishimura packed the room's belongings and left, and instructed

agents to lock the door when they left the room.   Moreover, the Court notes that

Special Agent Itnyre testified that after entry to the room and the initial protective

sweep, agents in the room contacted the agents holding Defendant in order to have

the agents inform Defendant of his eviction and ask Defendant what he wanted

done with his belongings.  Upon learning of his eviction, Defendant asked the

agents to have Nishimura pack and keep his personal belongings, but did not object

to the agents' presence in the room.

Sauta's actions in notifying agents of Defendant's eviction and

requesting assistance in completing that eviction evidenced "affirmative steps to

repossess the room," see Cunag, 386 F.3d at 895 (citing Dorais, 241 F.3d at 1128),

and had "justifiably terminated [Defendant's] control of the room through private

acts of dominion," see Baustia, 362 F.3d at 590.  The Court finds that Sauta's lack

of an attempt to take Defendant's keys, lock him out of the room, or personally

inform Defendant of his eviction prior to the agents' entry unpersuasive because

Sauta been informed of Defendant's arrest and knew that Defendant was being

detained by the FBI, therefore the hotel had no reason believe that Defendant

retained any way to access the room.[6]  It is the "affirmative act of repossession by

---

[6] The Aqua Island Colony Daily Security Journal confirms that the hotel
evicted Defendant.  (See hearing ("Hr'g"), Defendant's Ex. B ¶ 105.)  Sauta
clarified through his testimony that these entries recorded previous events.
Eastman clarified, that once Defendant, as the only properly registered guest was
evicted, Nishimura was trespassing and required removal. (See Hr'g,
Government's Ex. 12.) Although Defendant argued at the hearing that Nishimura
could be considered a registered guest, all the evidence submitted and testified to
clearly evidences that Nishimura was not in fact registered to the room.  (See id.)

the lessor" that "obliterates any cognizable expectation of privacy a lessee might have."  See Cunag, 386 F.3d at 895 (citing Dorais, 241 F.3d at 1129.)

As Young clarifies, all that is necessary is that the hotel take "any affirmative act that was a clear and unambiguous sign of eviction," not that the hotel directly inform Defendant of such an eviction. Young, 573 F.3d at 716-18 ("Young still believed he was a guest at the hotel, a reasonable belief given that the hotel had not actually evicted him or told him that he was evicted."); see also Cunag, 386 F.3d 888 (defendant conclusively evicted from his hotel room after hotel management confirmed that the room had been procured through credit card fraud and lockout done with the clear intention of permanently removing Cunag from the room as demonstrated by the simultaneous filing of a crime report with police).  The hotel's eviction of Defendant from the hotel premises was "readily apparent" as the hotel had discovered and confirmed Defendant's arrest and position in custody of the FBI agents and immediately took actions to inform the agents of Defendant's eviction and to complete the eviction of the room of occupants and belongings.  See Baustia, 573 F.3d at 719; see also People v. Washington, No. 280847, 2009 WL 186234 (Mich. App. Jan. 27, 2009) (unpublished) (All of the hotel employee's actions after receiving the fraud confirmation fax through the point of showing the police into and out of the hotel

19

room and culminating with locking defendant out of the room represent affirmative steps taken to regain control and possession of the fraudulently acquired room by hotel management.).

Additionally, the instant case is distinguishable from <u>Baustia</u> where, in that case, neither the motel's manager nor the police had reached a conclusion that Baustia had fraudulently procured the room, and therefore lacked cause to evict Baustia, and in fact did not ask the police to evict Baustia and the police did not suggest doing so.   See <u>Baustia</u>, 362 F.3d at 590.   The Ninth Circuit stated that "[u]ntil [the motel manager] made the determination and asked the police to evict Baustia, he was still a lawful occupant who retained a legitimate expectation of privacy in the room."  <u>Id.</u>  Unlike <u>Baustia</u>, in the instant case, the hotel, through Sauta, conclusively concluded that Defendant had been arrested, the hotel policy provided for automatic eviction upon arrest, and the hotel in fact evicted Defendant automatically upon his arrest.  See <u>id.</u> at 718-19.  Further, Sauta specifically requested agent assistance in completing the room's eviction of all occupants and belongings and the FBI agents agreed and completed such eviction with Sauta's presence and knowledge.

The instant facts weigh against a subjective expectation of privacy that society would recognize as objectively reasonable or legitimate.  Moreover,

20

due to Defendant's arrest and detention by agents, Defendant knew he would not

be returning to the room and sent the FBI agents to the room so that they could

give Nishimura his car keys—a task that reasonably required the agents to see into

the room, and a risk to which Defendant never objected.  Even when notified of his

previous eviction by agents, Defendant did not express surprise or contest his

eviction from the room or the agents' presence in the room, he simply requested

that Nishimura pack and keep his belongings.  Defendant carries the burden to

establish that he has a reasonable expectation of privacy in the place searched, and

has failed to meet this burden.  See Bautista, 362 F.3d at 589 (burden on defendant

to establish that he has a reasonable expectation of privacy in the place searched).

For all the reasons above, the Court finds that Defendant cannot

establish that he had a reasonable expectation of privacy in the hotel room.

B.      Reasonable Expectation of Privacy in Envelopes found in the Room

The Government argues that Defendant has not asserted any facts to

show that he had a reasonable expectation of privacy in the contents of the

envelopes found in the hotel room.  Defendant fails to respond to the

Government's contention, and therefore cannot meet his burden of proof.  See

United States v. Freitas, 716 F.2d 1216, 1220 n.2 (9th Cir. 1983) ("Where a

defendant fails to meet this burden in the suppression hearing, he cannot prevail on

21

appeal even though the Government also did not establish the contrary, unless, of course, the record on appeal independently demonstrates the requisite standing.") (citation omitted).

Once ejected for good cause, a room reverts to the control of the management, and the former occupant has no continuing right to privacy in the room.  Haddad, 558 F.2d at 975.  As the Haddad court stated, a justified eviction is no different than a termination of the rental period, when "the guest has completely lost the right to use the room and any privacy associated with it.  Id. (citation omitted); see also United States v. Croft,  429 F.2d 884, 887 (10th Cir. 1970) (a hotel guest's right to protection against unreasonable searches and seizures "is dependent on the right to private occupancy of the room" and if such a right is lost "the manager of the motel may then freely enter the room, rent the room to others, and remove any belongings left in the room" without an invasion of privacy); accord United States v. Parizo, 514 F.2d 52, 55 (2d Cir. 1975).

In the instant case, Sauta went with agents to ensure the occupants eviction from the room and to secure the room in the possession of hotel management according to hotel policy.  Once in the room, agents found pieces of evidence in the room believed to be related to Defendant's alleged sex trafficking enterprise.  As stated above, the Court finds that Defendant was formally evicted

and the hotel had reasserted control over the room when Sauta notified the FBI

agents of Defendant's eviction and requested that the agents assist him in

completing the eviction of the room's occupants and contents.  These actions

occurred prior to the agents' entry to the room and terminated any reasonable

expectation of privacy Defendant may have had in the room.  As Eastman testified,

King was the sole registered occupant of the hotel room and was automatically

evicted with his property upon his arrest.  (See also Hr'g, Gov. Ex. 4.)  Therefore,

any subsequent search of the room could not violate Defendant's Fourth

Amendment rights as any reasonable expectation of privacy by Defendant was

terminated with his eviction.

For all the reasons above, the Court finds Defendant cannot establish

that he had a reasonable expectation of privacy in the hotel room once he was

evicted.  Accordingly, the Court DENIES Defendant's Motion to suppress the

evidence recovered by agents from the hotel room.

II.    Seizure of "Trick Books" and Documents under the Plain View Exception

The Court has already determined that Defendant retained no

reasonable expectation of privacy in the room and that any seizure of evidence was

not in violation of Defendant's Fourth Amendment rights.  However, in an

abundance of caution, the Court will analyze how the plain view exception

provides an alternate ground of authority for the agents' seizure of certain items from the hotel room.  Defendant seeks to suppress the four notebooks seized by agents from the hotel room.   The Government argues that seizure of the books was lawfully within the plain view exception to the warrant requirement.  (Resp. at 16.)

Under the plain view exception, a law enforcement officer may seize evidence if (1) the officer "did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the item to be seized is in "plain view," (3) its "incriminating character" is "immediately apparent," and (4) the officer has "a lawful right of access to the object itself." Horton v. California, 496 U.S. 128, 136-37 (1990).  The "incriminating character" of the evidence is "immediately apparent" if the officer has probable cause to believe the evidence is associated with criminal activity.  See Minnesota v. Dickerson, 508 U.S. 366, 374-75 (1993); United States v. Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005).  Although the determination of whether the officers had probable cause to believe that the items seized were illegal, unlawful, or associated with criminal activity is objective," the Ninth Circuit applies this determination to the "actual and/or perceived belief of the law enforcement officer as [s]he . . . engages in search and seizure." Stafford, 416 F.3d at 1074.  This standard does not

24

require the officers to <u>know</u> that the item seized is associated with criminal

activity.  <u>Id.</u>

In the instant case, the agents' presence in the hotel room in which

they saw the books did not violate the Fourth Amendment, as addressed above.

Special Agent Itnyre testified that the "trick books" recovered by the FBI were

located in the living room of room 2420, one book under the coffee table and three

together sticking out from under the couch next to the coffee table.  From her

experience investigating human trafficking crimes such as Defendant's, Special

Agent Itnyre knew that pimps used "trick books" to record information relating to

prostitution customers and appointments.  Special Agent Itnyre testified that

information in such books often includes names of the customers, phone numbers,

dates, times of appointments, monetary figures, and geographic places where the

meetings occurred.

The notebook under the coffee table was open to a page on which

Special Agent Itnyre saw information indicating that the book was a "trick book."

The open notebook contained language relating to "in-calls," a term which was

described by Itnyre as terminology used by pimps to set up prostitution

appointments for customers where the customer came to the prostitute.

Specifically, the notebook was open to a page that read, in part: "Miko & Sparkles

25

incall 5pm-5:30pm 90 mins (1 ½ hr) $800.00." (See Hr'g, Government Exs. 13 &
14.)

Additional notebooks, similar to the one left open, could be viewed
sticking out from under the couch near the coffee table.  Special Agent Matthew
M. McDonald was the first to view Defendant's laptop on top of the coffee table
and testified that the laptop screen was clearly visible without requiring the agent
to physically touch the laptop.  Special Agent McDonald notified Special Agent
Itnyre of the laptop as possibly incriminating evidence.  Special Agent Itnyre
testified that she could see the laptop computer screen displaying a "craigslist.org"
Internet page with a login name of "Cherokee."  Itnyre testified that from her
previous investigation of Defendant, she knew that Defendant advertised
prostitution on craigslist.org, and she recognized the name "Cherokee" as being
associated with Defendant's prostitution business.  Itnyre testified that Nishimura
had told her of Defendant's use of craigslist and that other women had stated that
"Craigslist was [Defendant's] thing."  Further, at the hearing, the Government
presented examples of the Craigslist advertisements, including advertisements
from "Cherokee," that Special Agent Itnyre had previously viewed in her
investigation and believed belonged to Defendant through witness' statements.
(See Hr'g, Gov. Ex. 26.)

26

Special Agent Itnyre testified that two small digital storage media were inserted into the computer's USB ports.  In addition, Special Agent Itnyre saw miscellaneous papers next to the coffee table that also displayed prostitution related information much like the open notebook.  (See Hr'g, Gov. Ex. 15. ("escort pandora's" and "outcall pearl city 1hr@300").)  Moreover,  Special Agent Itnyre knew that Defendant had identified the hotel room as the room in which he had been staying with Nishimura, and that Nishimura assisted Defendant in his prostitution business.  Although only one notebook was open, Special Agent Itnyre testified that the other books appeared to be of a similar nature, and the fact that they were partially located under the couch created reasonable suspicion that they contained evidence.  (See Hr'g, Gov. Ex. 16.); see United States v. Issacs, 708 F.2d 1365, 1370 (9th Cir. 1983); cf. Whitten, 706 F.2d at 1013 ("There was nothing facially incriminating about the closed notebook from which the DEA agents could reasonably have concluded that it might contain evidence of crime.").

In conjunction, all of this information gave Special Agent Itnyre probable cause to believe that all the notebooks and papers, not just those where writing was visible, were associated with criminal activity.  See United States v. Whitten, 706 F.2d 1000, 1013 (9th Cir. 1983) (holding that the plain view exception justified the seizure of a tablet of paper that was open to a page reading,

27

"Move cars to new place. Calls: Sammy Roscoe; 10 [gallons]. Big. Glass beads, 60 degree adaptor," the incriminating nature of which was readily apparent in the context of an investigation into large-scale methamphetamine manufacture and distribution operation) implied overruling on other grounds recognized by United States v. Rodriguez-Rodriguez, 441 F.3d 767, 771 (9th Cir. 2006)).  Further, the mere opening of the notebooks showed information identical to that of the first notebook and provided substantial probable cause to believe that they were "trick books" associated with criminal activity.  See Issacs, 708 F.2d at 1369-70 (recognizing the propriety of a "brief perusal" of the books if items validly being searched for might reasonably be located within the book).

Finally, fourth, the agents had a lawful right of access to the notebooks because of their valid entry to the room.  See Horton, 496 U.S. at 137 n.7 (explaining that where officers see from the street obvious contraband inside a house, the officers nevertheless need a warrant to enter the house and access the contraband).  Therefore, the Court finds the plain view exception therefore justifies the agents' seizure of the "trick books" and the documents surrounding them.

Additionally, the Government asserts that the plain view doctrine justifies seizure of the documents recovered from the bedroom floor.  While in the bedroom of the hotel room where Nishimura was found pursuant to the agents'

protective sweep, Special Agent Tuan A. Payton noticed documents on the floor near the night stand. (See Hr'g, Gov. Ex. 27 ¶ 6.)  The documents included identification cards, social security cards, and blank checks, none of which were in Nishimura's or Defendant's names, scattered among six open white envelopes. (Id.)  Special Agent Tuan Payton stated that the loose documents were in plain view, and their incriminating character was immediately apparent, as they consisted of sensitive, private, and valuable documents in the names of people other than Defendant or Nishimura. (Id.; see also Hrg, Gov. Exs. 19-25.)

The Court finds that Special Agent Payton had probable cause to believe that the documents were associated with criminal activity such as fraud or identity theft.  See United States v. Giannetta, 909 F.2d 571, 579 (1st Cir. 1990) (holding that an envelope found in a bedroom containing blank birth certificates, blank identification cards, checks for accounts held in different names, and bank statements for accounts held in different names supported probable cause justifying a plain view seizure of the documents); see also United States v. Caymen, 404 F.3d 1196, 1200 (9th Cir. 2005) ("The Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen

property, such an expectation is not one that 'society is prepared to accept as reasonable.'") (citing <u>Smith v. Maryland</u>, 442 U.S. 735 (1979)).

In the instant case, the circumstances surrounding the agents' discovery of the evidence in the room creates a considerably more compelling application of the plain view exception than found in <u>United States v. Lemus</u>, --- F.3d ---, 2010 WL 548042 (9th Cir. 2010).  For all the reasons above, the FBI agents' seizure of the "trick books" and other documents fell under the plain view exception to the warrant requirement.

III.   <u>Seizure of the Contents of the Night Stand Drawer</u>

The Court has already determined that Defendant retained no reasonable expectation of privacy in the room.  In an abundance of caution, the Court will analyze a supplemental basis for why such evidence should not be suppressed.  Defendant argues that evidence obtained from the agents' search for weapons that resulted in the seizure of evidence from the room's night stand drawer should be suppressed.  (Mot. at 18.)  The Government asserts that Special Agent Julius F. Nutter's search of a drawer in the room did not violate the Fourth Amendment because it was not unreasonable. (Resp. at 20.)

As described above, room 2420, previously occupied by Defendant, consisted of a living room and kitchen area, a hallway, a bathroom, and a separate

bedroom.  When agents entered the room,[7] they conducted a protective sweep to ensure their safety from anyone who may have been present in the room.  Agents cleared all areas of the room before proceeding to the bedroom where they found Nishimura lying on the bed.  The agents handcuffed Nishimura and cleared the bedroom.  Special Agent Itnyre testified that she attempted to interview Nishimura but she was described as very emotional, visibly upset at Defendant's arrest and the agents' interference, and uncooperative.  Sauta testified that although Nishimura stated that she wanted to stay in the room, Sauta informed her of the eviction and that neither she nor her belongings could remain on the hotel premises.  At this time, Sauta again asked the agents to clear the room of all belongings and occupants.

During previous interviews, Special Agent Itnyre testified that she had been informed by witnesses that Defendant regularly carried a gun.  No weapons were found on Defendant upon his arrest.  Special Agent Itnyre decided to allow Nishimura to pack her belongings, necessitating Nishimura's un-handcuffed access to the room's contents.  The hotel had requested that agents assist in clearing the room of belongings and stay until the room was vacated. Itnyre testified that she

---

[7] Agents' entry to the room was not in violation of Defendant's Fourth Amendment rights as explained above.  Further, the agents' entry was further validated because Defendant directed the agents to give Nishimura his car keys.

believed it necessary to ensure there were not any weapons or anything that were

going to be packed by Nishimura or that could be used against agents by

Nishimura when she packed her belongings.  Due to the circumstances and concern

for officer safety, Special Agent Itnyre testified that she ordered agents to conduct

a search for weapons prior to allowing Nishimura to pack her belongings.  Further,

once Nishimura began packing her belongings, Itnyre testified that the agents in

the room called the agents with Defendant to inform Defendant of his eviction and

to ask Defendant what he wanted done with his belongings.  Defendant asked the

agents to have Nishimura pack and keep his personal belongings, but did not object

to the agents' presence in the room.[8]

            As part of the search for weapons, Special Agent Nutter looked inside

the night stand drawer, beside the bed where Nishimura was found lying.  (See

Hr'g, Ex. 6 ¶ 9.)  In the drawer, he found blank checks, other checks, and U.S.

_____

        [8] Defendant argues that Special Agent Itnrye's assertion that the search of
the night stand drawer was conducted due to officer safety is inconsistent with the
sworn affidavit of Special Agent Kristin Schmidt, executed and submitted to this
Court in support of a warrant request to search Defendant's computer and
peripheral devices.  The Court disagrees.  Special Agent Schmidt specifically
stated that her affidavit was for the limited purpose of establishing probable cause
for a warrant and disclaimed that the affidavit represented her full knowledge of
the matter.  Moreover, although the affidavit makes no mention of a search for
weapons in order to protect officer safety, it also does not mention Nishimura's act
of packing her own belongings or Defendant's.  In fact, Schmidt was not present
during the FBI's entry or search of the room.

savings bonds not in the name of Defendant or Nishimura, all of which were

apparently spilling out of a USPS envelope.  (Id.)  Special Agent Peyton collected

those documents in the envelope and recovered it as evidence.  (Id. ¶ 10.)

The Government argues that once Special Agent Nutter opened the

drawer to look for weapons, the documents fell under the plain view exception

because the documents' incriminating character was immediately apparent, as

described above.  See Horton, 496 U.S. at 135 ("the 'plain view' doctrine has been

applied where a police officer is not searching for evidence against the accused, but

nonetheless inadvertently comes across an incriminating object.") (citing Harris v.

United States, 390 U.S. 234 (1968)).

Defendant argues that agents' role in assisting in the eviction of

Nishimura did not require a search of the room, even assuming their assistance

required "entry and security until the eviction was complete."  (Mot. at 18.)  In

support of this argument, Defendant cites United States v. Lemus, 582 F.3d 958

(9th Cir. 2009), for the proposition that, "[a] protective sweep is not a license to

search every nook and cranny of a house, but is subject to two significant

limitations: it 'extend[s] only to a cursory inspection of those spaces where a

person may be found' and lasts 'no longer than it takes to complete the arrest and

depart the premises.'"  Id. at 962 (citation omitted).  Further, Defendant cites

33

Cuevas v. De Roco, 531 F.3d 726 (2008) for the proposition that opening a drawer in the process of a lawful protective sweep incident to an in-house arrest exceeds both the consent given and the limits the sweep.  See id. at 735 (citing Maryland v. Buie, 494 U.S. 325, 327 (1990) (explaining that a permissible protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding")).

The Ninth Circuit has held lawful a "protective sweep" of an area in and near which a person has been or is being arrested.  See Lemus, 582 F.3d at 962.  It is also well established that officers may also conduct cursory searches of premises, without an arrest, for persons who may threaten the safety of the officers.  United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993).  However, here, Defendant was arrested in the hotel lobby and was detained by the FBI in the hotel parking lot at the time of the agents' sweep for weapons in the room.  Further, the parties agree that the evidence in the night stand drawer was found pursuant to the agents' search for weapons, not persons who may have threatened the safety of the officers.  The weapons search in the instant case was distinctly different from the prior protective sweep performed by agents and cannot be analyzed under case law doctrine regarding protective sweeps by law enforcement.

It is the Government's position that a search for weapons was necessary to protect the agents, whose safety is a matter of Governmental interest. "The reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate Governmental interests." United States v. Knights, 534 U.S. 112, 118-119 (2001) (quotation omitted).  A court must determine "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. 1, 27 (1968).  An in-home arrest puts law enforcement officers at a disadvantage, and allows arresting officers to take reasonable steps to ensure their safety after, and while making, the arrest. United States v. Lemus,582 F.3d 958, 961-62 (9th Cir. 2009).

The Court notes that even if on appeal Defendant was found to have retained any privacy in the room after his eviction, the degree of privacy retained would not be significant under the totality of the circumstances.  Additionally, while a hotel room may differ slightly from an in-home situation, Defendant and Nishimura still had the opportunity to hide weapons in the room just as they would have in a home.  Because Nishimura was tasked with packing her belongings, the officers believed it necessary to secure the area from any danger posed to them.

The Government argues that in the instant case, it would have been unreasonable for Special Agent Nutter to have left the drawer unsearched and jeopardized the safety of all present should Nishimura have gained access to a loaded gun.  See United States v. Flippin, 924 F.2d 163 (1991) (holding an officer's reasonable suspicion that the suspect was armed was sufficient justification for seizure of suspect's makeup bag and exigent circumstances justified the subsequent warrantless search of the closed bag).

Defendant counters that, here, a search for weapons pursuant to concern for officer safety does not validate the search because "if the exigent circumstances resulted from the agent's own improper conduct, these circumstances cannot be relied upon as an excuse."  United States v. Driver, 776 F.2d 807, 810 (9th Cir. 1985) (citation omitted).  The Court disagrees.  In the instant case, the agents were in the room primarily at the behest of the hotel to assist in the eviction of Nishimura and the securing of the hotel room, and secondarily at the behest of Defendant in order to provide Nishimura with his car keys.  Defendant told agents that Nishimura was in the room and agents had confirming information of this fact.  Because Nishimura did not answer the door when Sauta and agents knocked and announced their presence, it was necessary for the agents to enter the room in order to secure her removal from the premises.

36

Further, Defendant also later directed agents to inform Nishimura of his wish that she pack and keep his personal belongings.

Police must be allowed to protect themselves before a potential threat of danger develops into a tragedy. <u>Flippin</u>, 924 F.2d at 166. In <u>Flippin</u>, the Ninth found the evidence at issue was not subject to suppression because the search and seizure were based on exigent circumstances related to the potential danger to the officer and others. <u>Id.</u> at 167. The court relied heavily on <u>Buie</u>, which recognized a lower standard than probable cause under such circumstances. <u>See Buie</u>, 494 U.S. 325 (holding the Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.)

Moreover, the Ninth Circuit distinguished <u>Flippin</u> from <u>United States v. Vaughan</u>, 718 F.2d 332 (9th Cir. 1983), in which evidence found in the warrantless search of a soft briefcase was suppressed because the officer, who claimed he was looking for a weapon when he opened the soft container, could have just as effectively "patted down" the pliable container without opening it. As <u>Flippin</u> explained, the relevant question is "whether the danger justifying the seizure still existed once the officer had custody of the container. If the exigency

37

was gone, a search warrant must be obtained before it may be opened."  Flippin, 924 F.2d at 166.

In the instant case, the agents could not ensure their safety without opening the drawer pursuant to a limited search for weapons.  Allowing Nishimura to pack Defendant's belongings necessarily meant allowing her un-handcuffed access to the room in its entirety, including the room's drawers where it was logical to believe that Nishimura or King would have placed items.  The agents had no way to ensure the room did not contain a weapon accessible to Nishimura, when Defendant was known to have one in his possession and it was not found on his body, without first securing the area, including the night stand drawer.  See United States v. Humphrey, 759 F.2d 743 (9th Cir. 1985) (limited protective "search" for and temporary "seizure" of guns was justified by security considerations and provided independent cause for Coast Guard safety inspection below deck.) (citing cf. Terry, 392 U.S. at 24 (approving limited search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm" incident to an investigative stop)); Michigan v. Long, 463 U.S. 1032, 1049-50 (1983) (where officer reasonably believed that the suspect was dangerous and might gain immediate control of weapons, search of passenger compartment of automobile for hidden weapon was permissible even when suspect was "under the

38

control" of officers but not placed under arrest); United States v. Williams, 419

F.3d 1029, 1034 (9th Cir. 2005) ("we think it best left to the discretion of the

officers in the field who confront myriad circumstances we can only being to

imagine from the relative safety of our chambers.").

> An action is "reasonable" under the Fourth Amendment, regardless of

the individual officer's state of mind, "as long as the circumstances, viewed

objectively, justify [the] action." Scott v. United States, 436 U.S. 128, 138 (1978)

(emphasis added).  In the instant case, the agents' limited search for weapons was

reasonable in order to ensure officer safety prior to Nishimura's access to her and

Defendant's belongings.  Long, 463 U.S. at 1049 (protection of police and others

can justify protective searches when police have a reasonable belief that the

suspect poses a danger).  Further, the search was reasonable as a goal of public

safety as the FBI did not intend to keep Nishimura in custody at that time and

wanted to avoid the possibility of providing Nishimura access to a weapon once

beyond FBI supervision.  See Cady v. Dombrowski, 413 U.S. 433(1973) (finding

police officer's opening of car's trunk without warrant did not violate Fourth

Amendment because officer reasonably believed trunk contained gun, trunk was

vulnerable to intrusion by vandals, and public might be endangered if intruder

removed gun); United States v. Feldman, 788 F.2d 544, 553 (9th Cir. 1986)

(finding that inventory search of car done on-the-spot was lawful because officer reasonably suspected that car contained gun and search was reasonable to ensure the immediate protection of the public's safety); but see United States v. Gooch, 6 F.3d at 680 (finding search without warrant of arrested defendant's tent in which officers believed there was a firearm not justified by need to protect public because officers could have prevented children from entering tent until warrant was obtained).

A night stand drawer is certainly a place where a weapon may be placed or hidden in easy reach.   In the instant case, the officers did not conduct the search in order to search for evidence against Defendant, but nonetheless inadvertently encountered incriminating documents in plain view pursuant to the search.  See Horton, 496 U.S. at 135; see Long, 463 U.S. at 1049 ("If, while conducting a legitimate Terry search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.")  Accordingly, the Court finds that based on the circumstances, agents had an objectively reasonable belief based on specific and articulable facts that a search for weapons was necessary prior to providing Nishimura access to her and Defendant's belongings.

40

IV.    Good Faith

In addition to the multiple grounds justifying the agents' search and seizure, as described above, in the instant case, the evidence recovered as a result of the FBI agents' entry of the hotel room and seizure of the evidence inside would not be subject to suppression, even if the agents' actions were found to be unlawful.

The Supreme Court recently has emphasized that the exclusionary rule should not apply in the absence of misconduct by agents recovering evidence.  See Herring v. United States, - U.S. - , 129 S. Ct. 695, 702 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").  In Herring, the Supreme Court reiterated that the Fourth Amendment does not preclude the use of evidence obtained in violation of its commands.  Id. at 699-701 (citations omitted).  Instead, case law establishes an exclusionary rule that is designed to safeguard Fourth Amendment rights through its appreciable deterrent effect, when doing so will outweighs the costs.  Id.

The Herring court held that the exclusionary rule should not apply to evidence collected by agents who acted in good faith due to a belief they legally

41

had the right to collect evidence where such actions were evidence of isolated

"police mistakes [that] are the result of negligence . . . , rather than systemic error

or reckless disregard of constitutional requirements, [because] any marginal

deterrence does not 'pay its way.'"  Id. at 703; see also United States v. Peltier, 422

U.S. 531, 542 (1975) ("[E]vidence obtained from a search should be suppressed

only if it can be said that the law enforcement officer had knowledge, or may

properly be charged with knowledge, that the search was unconstitutional under the

Fourth Amendment."); United States v. Leon, 468 U.S. 897, 904 n.4, 922 (officer

who acted on a warrant later found to be invalid found to have acted objectively

reasonably and evidence was not suppressed where the officer obtained a warrant,

conducted surveillance, and consulted with three Deputy District Attorneys before

proceeding).   This analysis is "objective, not an inquiry into the subjective

awareness of arresting officers."  Id. at 703 (quotations omitted).  Therefore, the

"'good-faith inquiry is confined to the objectively ascertainable question whether a

reasonably well trained officer would have known that the search was illegal' in

light of 'all of the circumstances.'"  Id. (quoting Leon, 468 U.S. at 922).

A reasonably well trained FBI agent would not have known Special

Agent Itnyre's search of the room was unconstitutional in light of all of the

circumstances.  Special Agent Itnyre was reasonable in believing that Defendant

42

had been evicted from the hotel room and retained no right to privacy in the room.

When Itnyre re-entered the hotel after Defendant's arrest, she was met by Sauta

who informed Special Agent Itnyre that it was hotel policy to immediately evict

any hotel guest physically arrested by law enforcement and that Defendant had

been automatically evicted due pursuant to such policy at his arrest.  Sauta asked

the agents to assist him with completing the room's eviction of Defendant's

belongings and any other individuals associated with his room.  Once assistance

was requested of her by the hotel, Itnyre agreed to help complete the eviction of the

room's belongings and occupants.  Under the circumstances, it was reasonable for

Itnyre to believe that the hotel had authority to authorize such action.  The Court

cannot expect law enforcement officers to be experts on the legality or

appropriateness of a hotel eviction policy.  If a hotel agent with the authority of

management advises an agent that someone has been lawfully evicted from the

hotel and there are no tangential circumstances suggesting otherwise, the agents are

entitled to assume such eviction was lawful.  Here, the agents' actual entry into the

room was pure happenstance at the request of the hotel.

     Moreover, subjectively, this is not a situation where agents had a pre-

textual reason to enter and search.  Special Agent Itnyre testified that upon entry of

the room, she had no intention of searching for evidence, instead her objectives

43

were to provide Nishimura with Defendant's car keys,[9] assist the hotel in

completing the room's eviction, and to talk with Nishimura.  In fact, Itnyre did not

have an FBI search kit with her and had not prepared an operational plan for how

evidence would be searched for or collected.  Further, Itnyre did not immediately

ask for the keys to the room and resorted to requesting keys from Sauta only when

Nishimura did not answer the door.  Because Defendant had informed Itnyre that

Nishimura was in fact inside the room, and Special Agent Itnyre had corroborating

evidence of this fact, Itnyre believed that it was necessary to enter the room in

order to remove Nishimura from the premises.  When asked by defense counsel

why she failed to secure a warrant before entering the room, Special Agent Itnyre

responded that she did not obtain a warrant because she had no intention of

searching the room.

However, upon seeing what Special Agent Itnyre described as

incriminating evidence in plain view, Itnyre stated that she wanted to preserve the

evidence.[10]  A reasonable FBI agent in her position would have believed that upon

---

[9] Because the agents had been informed of Defendant's eviction and had
agreed to assist the hotel in completing such eviction, it would not have been an
option for Itnyre to leave Defendant's keys with the front desk or Sauta for
Nishimura as suggested by Defendant.

[10] The Court notes that such evidence would have been in plain view
(continued...)

valid entry to the room, evidence in plain view was subject to lawful seizure.

Further, Special Agent Itnyre was faced with the situation of allowing Nishimura

to pack her belongings while agents were still present in the room.  Having been

told by witnesses that Defendant regularly carried a gun, Special Agent Itnyre was

concerned for the safety of her team if she was to allow Nishimura, who was an

upset,  uncooperative known associate of King's, un-handcuffed access to the

room's contents.  As explained above, a limited search for weapons was a

reasonable action under the circumstances presented.  See Williams, 419 F.3d at

1034 ("we think it best left to the discretion of the officers in the field who

confront myriad circumstances we can only being to imagine from the relative

safety of our chambers.").

       Additionally, Special Agent Itnyre testified that she called the Chief

Division Counsel ("CDC")—FBI legal counsel—to ensure that she would not be

violating the Fourth Amendment before seizing evidence in the hotel room.[11]  The

---

[10](...continued)
whether or not Defendant was evicted from the hotel room as the agents were
tasked by Defendant with providing Nishimura with Defendant's car keys and
were in the process of assisting the hotel in Nishimura's eviction.  Further, as
stated above, Nishimura was not a registered guest of the room, but Defendant's
guest in the room.

[11] The testimony is not clear as to when Special Agent Itnyre called the
                          (continued...)

CDC informed her that agents could seize the evidence found in plain view and pursuant to the search for weapons conducted prior to letting Nishimura pack her belongings. All evidence collected by the agents in the room was in plain view or found during the search for weapons. Special Agent Itnyre had a reasonable belief in the lawfulness of her team's seizure of evidence because she reasonably relied on the advice of her office's legal counsel. This reliance was objectively reasonable, as a Special Agent in the field would reasonably rely on the advice of legal counsel, especially in situations requiring immediate action on the part of the agent. See Herring, 129 S. Ct. at 703 (quoting Leon, 468 U.S. at 922, n. 23) ("our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances.")). Special Agent Itnyre's call to her office's legal counsel negates any charge that she had knowledge that seizure of the evidence was unlawful. For all the reasons above, even if the search and seizure

---

[11](...continued)
CDC. Special Agent Nutter stated in his declaration that he remembered Itnyre calling CDC before the agents entered the hotel suite and again after the agents were inside and noticed items of possible evidentiary value. (See Hr'g, Gov. Ex. 6 ¶ 8.) On direct, Itnyre testified that she called CDC once inside the room, but did not make clear when the call was made in the process of viewing and recovering evidence. However, Itnyre's testimony implies that she made the call prior to collecting evidence in plain view, but after performing the search for weapons.

46

was to be held unlawful, it was the result of "isolated negligence" on the part of the FBI's legal counsel or misplaced reliance on hotel authority, not because of any objectively deliberate or culpable behavior on the part of Special Agent Itnyre as to require suppression of the evidence obtained.[12]

Moreover, because of Special Agent Itnyre's objectively reasonable belief that her search was lawful, any deterrent effect of suppressing the evidence in this limited fact pattern is not worth the cost of exclusion.  Herring, 129 S. Ct. at 702 n.4 (any deterrence must "be weighed against the substantial social costs exacted by the exclusionary rule[.]") (citing Illinois v. Krull, 480 U.S. 340 (1987)) (internal quotations omitted).  For all the reasons above, the Court finds that none of the evidence obtained from the entry and search of Defendant's room, as presented to the Court, is subject to suppression.

V.     Voluntariness of Defendant's Statements

Defendant next argues that the statements he made to FBI agents while in custody after arrest, are inadmissible under both the Due Process and

---

[12] Although defense counsel states that Herring requires that any isolated negligence be attenuated from the FBI agents' search in order for the exclusionary rule not to apply, the Herring court instead focused on the deliberateness and culpability of the officers' conduct and stated that the fact that any negligence was attenuated from the actions of the arresting officers went to the officers lack of deliberateness and culpability.  See Herring, 129 S. Ct. at 699-704.

Self-Incrimination Clauses of the Fifth Amendment because they were not

voluntarily made.  (Mot. at 24.)   In support, Defendant claims that during the

course of his arrest, an agent unintentionally injured Defendant's hand and failed to

obtain medical treatment for Defendant prior to obtaining Defendant's <u>Miranda</u>

waiver and statement.  (<u>Id.</u>)  Defendant argues that the pain and discomfort caused

by his hand injury rendered his statement and waiver involuntary, and the agents'

failure to obtain medical care for him amounted to improper coercion.  (<u>Id.</u>)

From the agents' testimony, the facts evidence that upon being

informed of the warrant for his arrest, Defendant obeyed agents' instructions to lie

face down on the ground and submit to handcuffs.  Defendant did not struggle.

Special Agent Rachel Byrd testified that she kicked a set of car keys away from

Defendant's hand while he was on the ground, but denied that her foot made

contact with Defendant.  Byrd then handcuffed Defendant and remembered him

possibly stating something to the effect of "be careful with my wrist."  Then

Special Agent Byrd and Special Agent Jeff Felman waited with Defendant in the

parking structure for about an hour after his arrest while the other agents were in

the hotel.

Both agents testified that they recalled that Defendant and Agent Byrd

engaged in small talk to pass the time, but that Defendant did not complain of

48

serious pain.  Agent Felman had no recollection of Defendant complaining of any

pain, while Agent Byrd recalled that Defendant mentioned that something hurt, but

that Defendant did not give the impression that it was serious.  Neither agent

remembered Defendant ever asking for medical attention and neither agent felt that

such attention was necessary.

After finishing at the hotel, the agents brought Defendant back to the

FBI office where they booked and fingerprinted him.  Special Agent Russell

Romero fingerprinted Defendant, taking prints from all ten digits on Defendant's

hands, which entailed holding Defendant's hands and manipulating his fingers to

roll them across the fingerprint scanner.  (Resp., Ex. 3.)  However, Special Agent

Romero does not recall Defendant ever complaining of any pain.  (Id.)

Special Agents Itnyre and Matthew McDonald then interviewed

Defendant at about 12:15 a.m.[13] on May, 10, 2008.  Prior to the substantive

interview, Special Agent Itnyre read Defendant an FBI "Advice of Rights" waiver

form, which Defendant then read himself.  The waiver stated, "I have read this

statement of my rights and I understand what my rights are. At this time, I am

willing to answer questions without a lawyer present."  (Resp.,  Ex. 2.)  Defendant

---

[13] Special Agent Itnyre testified that the interview and waiver of rights
occurred at approximately 1:15 a.m., however, the Advice of Rights form signed
by Defendant reflects a time of "0:15 HRS."  (See Hr'g, Gov. Ex. 10.)

49

then signed a waiver of those rights, agreeing to speak with the agents without a lawyer.

The warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), apply to custodial interrogations, meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. Miranda warnings must be administered only where there has been such a restriction on a person's freedom as to render him in custody. Crawford, 372 F.3d at 1059 (citations omitted).

The parties do not dispute that Defendant was in custody at the time of FBI questioning and was provided with Miranda warnings prior to such questioning. However, a waiver of rights to silence and counsel under Miranda must be "the product of a rational intellect and a free will." United States v. Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988) (citation omitted). The Government must prove the voluntariness of Defendant's statements by a preponderance of the evidence. Id. (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)). The test for voluntariness is "whether, considering the totality of the circumstances, the Government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Id. at 1365-66

50

(citation omitted); see also Doody v. Schriro, 548 F.3d 847, 858–869 (9th Cir.

2008) (discussing Miranda warnings in the context of the Fifth Amendment right

against self-incrimination and the Due Process Clause of the Fourteenth

Amendment).

Confessions made after advisement and waiver of Miranda warnings

are "likely voluntary." DeWeaver v. Runnels, 556 F.3d 995, 1003 (9th Cir. 2009)

(citing Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings

and getting a waiver has generally produced a virtual ticket of admissibility.")); see

also Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a

defendant can make a colorable argument that a self-incriminating statement was

'compelled' despite the fact that the law enforcement authorities adhered to the

dictates of Miranda are rare.").

A court must consider the "totality of the circumstances" in

determining whether a Defendant's statement was voluntary. DeWeaver, 556 F.3d

at 1003 (citation omitted). The Ninth Circuit has held that serious pain and

discomfort does not necessarily render confessions involuntary. See United States

v. Martin, 781 F.2d 671, 673-74 (9th Cir. 1985) (holding that a defendant's

statement made outside of police custody was voluntary because he was "awake

and relatively coherent during the questioning" despite painful injuries). In United

States v. Coleman, 208 F.3d 786 (9th Cir. 2000), the Ninth Circuit considered the

voluntariness of statements given outside of police custody by a defendant

suffering from heroin withdrawal.  See id. at 789.  The court held that "although

Defendant's heroin withdrawal caused lethargy and physical discomfort, such

symptoms alone are insufficient to establish involuntariness."  Id. at 791 (citation

omitted).

     Here, the totality of the circumstances overwhelming establishes that

despite Defendant's injured hand, Defendant's statements to the FBI were

voluntary.  As the facts show above, Defendant failed to give FBI agents any

indication of a medical condition necessitating treatment prior to his interrogation,

even through arrest and fingerprinting.

     Special Agent McDonald recalled Defendant complained of pain in

his hand only at the beginning of his one-to-two-hour interview.  McDonald

testified that Defendant stated his hand was hurting and held his hand out so the

Special Agent could check more closely for injury.  Special Agent McDonald

believed he might have seen some swelling, and when he touched Defendant's

hand, Defendant reacted "dramatically" in a way that the Special Agent felt was

"overdone."  McDonald testified that Defendant was asked if he needed medical

treatment, which he declined so the interview continued.  Special Agent McDonald

52

testified that Defendant did not mention the pain further and did not seem

preoccupied with the pain and never requested medical attention.  Instead, Special

Agent McDonald recalled that Defendant communicated calmly, intelligently, and

coherently, and struck McDonald as charming and eloquent.   Further, McDonald

testified that Defendant's hand gestures seemed inconsistent with someone with a

painful hand injury.

Special Agent Itnyre was also present for the interview.  She did not

remember the events described by Special Agent McDonald.  Itnyre recalled that

Defendant mentioned that his wrist or some part of his arm was sore, but

remembers that Defendant made the comment as an aside.  Special Agent Itnyre

did not see any indication of a serious injury, and Defendant did not ask for any

medical attention or for the interview to end and spoke coherently and responded

to the questions asked cooperatively without any sign of distraction from pain.

Itnyre testified that the interview lasted less than an hour and that she did not

believe that Defendant was handcuffed to the wall during the interview, but that

she could not remember.

The morning after his interview, Defendant received an injury

assessment while incarcerated at the Federal Detention Center.  (See Hr'g,

Defendant's Ex. C.)  The injury assessment states that Defendant's right hand had

swelling to "dorsal surface, 4th metacarpal" and diagnosed Defendant with a fracture to his right hand.  (Id.)  The assessment ordered Ibuprofen 400 mg for pain and consult for xray.  (Id.)  Defendant reported the injury as occurring during his arrest and stated that he had a previous fracture to the same hand nine months prior.  (Id.)  The record shows that Defendant did not obtain any follow-up treatment for his injured hand until May 21, 2008, while incarcerated at the Federal Detention Center.  (See Mot, Exh. E.) Although this treatment was provided ten days after Defendant's injury assessment, Defendant does not ever assert that he requested medical treatment before this date and was denied such treatment.  The radiology report evidenced a healing displaced fracture of the distal aspect of the fifth metacarpal with periosteal reaction and callus formation.  (Id.)  The report does not specify any follow up treatment for the fracture.  (Id.)

The Court finds that the agents' testimony regarding Defendant's demeanor during the interview and the reports of Defendant's medical treatment conclusively show that any hand injury Defendant endured during agent questioning was not so painful as to cause "physical or psychological coercion or . . . improper inducement so that the suspect's will was overborne."  See Guerrero, 847 F.2d at 1365-66.  In fact, the only treatment ever prescribed to Defendant was 40 mg of Ibuprofen.  Moreover, the detailed nature of Defendant's statements as

testified to by the agents evidence Defendant's coherent nature.  The Court finds

that the evidence establishes that Defendant's statements, made after he reviewed

and signed a written waiver of his Miranda rights, were not rendered involuntary

due to Defendant's hand injury.

        For the reasons stated above, the Court finds that Defendant's

statements were the product of a rational intellect and a free will and subject to the

Miranda waiver.  Accordingly, the Court DENIES Defendant's motion to suppress

Defendant's statements.

## VI.    Suppression of the Computer and Peripheral Devices

        Defendant argues that any evidence obtained pursuant to the

Government's search warrant from the two thumb drives seized from Defendant's

possession upon arrest, or from the laptop computer, thumb drive, and memory

stick seized from the hotel room should be suppressed because the Government did

not comply with the requirements set forth in United States v. Comprehensive

Drug Testing, Inc., 579 F.3d 989 (9th Cir. 2009) (hereinafter "CDT").  (Mot. at

22.)

        Defendant challenges the search of the computer solely on the basis of

the Ninth Circuit's recent CDT opinion.  CDT involved an "over-seizure" by law

enforcement.  See id. at 1006.  Federal agents, in the process of looking for other

data pursuant to a search warrant, seized specific computer data that was not

authorized in the search warrant and for which the agents lacked probable cause for

search and seizure.  See id. at 993-94, 1006.  The Ninth Circuit held that when

issuing a warrant to search a computer hard drive or electronic storage device,

"magistrate judges must be vigilant in observing" certain procedural requirements

as to avoid access to information outside the scope of the warrant and for which

there is no probable cause.  Id. at 1006.

Defendant does not elucidate for the Court how the agents' search in

the instant case of Defendant's laptop computer and peripheral devices did not

comply with CDT or the Fourth Amendment.  In opposition, the Government

argues that the search warrant permitted the search and seizure of evidence of sex

trafficking offenses, and no issue exists regarding an over-search or seizure by the

agents involving evidence of unrelated crimes while searching pursuant to the

warrant. (Resp. at 23.)

On July 2, 2009, Magistrate Judge Kobayashi signed a search warrant

allowing the Government to search Defendant's computer and peripheral devices.

(Mot., Ex. A.)  In support of the warrant, the Government provided Magistrate

Judge Kobayashi with the affidavit of Special Agent Kristin Schmidt ("Schmidt

Affidavit") as evidence of probable cause.  (Id., Ex. B.)

56

The Schmidt Affidavit alleged that the search warrant was necessary because Special Agent Schmidt had probable cause to believe that evidence of Defendant's crimes of commercial sex trafficking of adults though force, fraud, or coercion and sex trafficking of minors was located in the items to be searched. (See id. ¶ 2.)  The search warrant approved by Magistrate Judge Kobayashi was limited as to the place to be searched as it specifically listed the computer and peripheral devices seized from Defendant.  (See id., Ex. A at 2; id., Ex. C.) Further, the search warrant was limited to evidence of crimes for which there was probable cause as provided by the Schmidt Affidavit.  (See id., Ex. A at 2 ("Affiant has reason to believe that in the property described in greater detail above, in the District of Hawaii, there is now being concealed ceratin property, identified in Attachment B, the list of "Items Authorized to be Searched-for and Seized," which list is incorporated herein aby reference and made a part hereof[.]"); id., Ex. D.)

Moreover, the Schmidt Affidavit provides background regarding the use of computers and the internet in sex trafficking crimes based on the training, knowledge, and experiences of Special Agent Schmidt and other law enforcement personnel involved in her investigation.  (See Mot., Ex. B.)  Specifically, the Schmidt Affidavit illustrates how operators of sex trafficking rings often use computer technology and peripheral devices to advertise the availability of

57

commercial sex and list email addresses, telephone numbers, and upload photographs to the public via internet websites such as Craigslist.  (<u>Id.</u> ¶ 15.)

The Schmidt Affidavit informed the search warrant by showing how storage on digital computer equipment, including computer files and remnants of such files, could be retrieved or recovered even after they are deleted.  (<u>Id.</u> ¶ 15.) In doing so, the Schmidt Affidavit discloses the procedures necessary to adequately execute the agents' search including the protocol of seizing computer equipment for later search in forensically sound facilities and the search methodology to be employed.  (<u>Id.</u> ¶ 16-17; <u>see</u> <u>also</u> <u>id.</u>, Ex. D (detailed list of nineteen types of items pertaining to sex trafficking or conspiracy crimes that were to be searched for and seized from Defendant's computer and peripheral devices by federal agents.)

Further, the Schmidt Affidavit details law enforcement's investigation of Defendant.  (<u>Id.</u> ¶ 18-46.)  According to Special Agent Schmidt, interviews with five different individuals involved in Defendant's alleged prostitution enterprise identified Defendant's <u>modus</u> <u>operandi</u> as advertising prostitution services via Craigslist.  (<u>Id.</u> ¶ 23, 26-29.)  The events leading up to law enforcement's seizure of Defendant's computer and peripheral devices are also outlined, including Special Agent Itnyre observation of the laptop on

58

the coffee table in the front room of the hotel room with the URL

http://accounts.craigslist.org/email/handle:cherokee   was visible on the screen and

a dialog box displayed an account login for the Craigslist account associated with

the username "Cherokee."   (Id. ¶ 35-46.)  Special Agent Itnyre recognized the

name "Cherokee" from Craigslist postings related to the solicitation of prostitution

that were associated with Defendant's email accounts.  (Id. ¶ 42.)  According to

Special Agent Itnyre, the name "Cherokee" is associated with a female adult whom

Defendant engaged in prostitution.  (Id. ¶ 42.)  Additionally, the Schmidt Affidavit

recounts how Special Agent Itnyre also observed a thumb drive and memory stick

inserted in the computer and that two additional thumb drives were recovered from

Defendant's person in the lobby of the hotel during a search incident to his arrest.

(Id. ¶ 43-44.)

          According to the Government, execution of the search warrant on

Defendant's laptop computer and peripheral devices produced digital photographs

of naked and scantily clad women.  (Resp. at 10-11.)  The images included

photographs of Nishimura, as well as two other women identified as Defendant's

victims scantily clad and posing suggestively.  (Id.)  In addition, templates of

Government identifications, scanned images of handwritten notes of names, phone

numbers, and credit card numbers of potential clients were discovered by law

enforcement.  (Id.)

As stated above, the Fourth Amendment provides that "no Warrants

shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be

seized."  U.S. Const. amend. IV.  A magistrate may authorize a search of a location

only if officers establish probable cause to believe evidence of a crime may be

found there.  United States v. Hill, 459 F.3d 966, 970 (9th Cir. 2006).  "Probable

cause means only a 'fair probability,' not certainty, and requires consideration of

the totality of the circumstances."  Id., (citing Illinois v. Gates, 462 U.S. 213, 238

(1983)).  The Ninth Circuit has held that "[b]ased on the nature of the evidence and

the type of offense, a magistrate may draw reasonable inferences about where

evidence is likely to be kept."  United States v. Vaandering, 50 F.3d 696, 700 (9th

Cir. 1995) (quotation omitted).

Further, with respect to Defendant's reliance on CDT, in order to be

valid under the Fourth Amendment, a warrant must be specific, that is particular

and not overbroad.  See Hill, 459 F.3d at 973.  "Particularity is the requirement that

the warrant must clearly state what is sought.  Breadth deals with the requirement

that the scope of the warrant be limited to the probable cause on which the warrant

is based."  Id.; Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) ("[T]hose

searches deemed necessary should be as limited as possible.").

   In the instant case, the Schmidt Affidavit contained sufficient facts for

probable cause to believe that evidence of commercial sex trafficking of adults and

minors would be found on Defendant's computer and peripheral devices.

Moreover, the Affidavit contained a clearly delineated list of nineteen types of

items pertaining to crimes of commercial sex trafficking that law enforcement

sought.  (Mot., Ex. D ¶ 1-19.)  Law enforcement limited its search of Defendant's

computer and peripheral devices to that which would produce evidence of

Defendant's alleged prostitution crimes and, in fact, search pursuant to the warrant

produced evidence related only to the crimes for which Defendant was suspected.

   Nevertheless, Defendant asserts that the computer evidence should be

suppressed because the search did not comply with the requirements set forth in

CDT.  CDT involved "deliberate overreaching by the Government in an effort to

seize data as to which it lacked probable cause." CDT, 579 F.3d at 1000.  The CDT

court was particularly concerned that with the overbreadth of computer evidence,

as "the process of segregating electronic data that is seizable from that which is not

must not become a vehicle for the Government to gain access to data which it has

no probable cause to collect."  Id. at 1006.

In contrast, the instant case involves a search warrant and supporting affidavit that sufficiently establish a basis for probable cause to search Defendant's computer and peripheral devices for evidence related to sex trafficking or conspiracy, and a search protocols, including specific items to be searched for and seized, designed to locate only evidence related to such crimes.  Further, as explained above, the search produced only evidence pertaining to those crimes and such evidence was not used by law enforcement as the basis for additional charges or further search warrants as in <u>CDT</u>.[14]

Moreover, as explained above, the exclusionary rule should not apply to evidence seized in honest compliance with a warrant that comports with the Fourth Amendment but does not include all of the "procedures" outlined in CDT.[15]

_____

[14] Additionally, the <u>CDT</u> court specifically stated that the rules it announced, including those cited by Defendant, were to be "useful tool[s] for the future." <u>CDT</u>, 579 F.3d at 1007.  The court repeated this intention more than once, noting in particular that only "future warrant applications" should "forswear reliance on the plain view doctrine or any similar doctrine that would allow it to retain data to which it has gained access only because it was required to segregate seizable from non-seizable data[,]" <u>id.</u> at 998, and that it required the "a protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown" only "[t]o guard against such unlawful conduct in the future."  <u>Id.</u> at 1000. The warrant in this case issued on July 2, 2009, and the <u>CDT</u> opinion was filed on August 26, 2009.

[15] Even when police act under a warrant that is invalid for lack of probable cause, "the exclusionary rule does not apply if the police acted 'in objectively

(continued...)

62

See CDT, 579 F.3d at 1006.  The CDT opinion itself does not claim to base its

"procedures" on the Fourth Amendment.  See id. at 1006 (describing the opinion as

"guidance" for magistrate judges); id. at 1013 (stating that the majority's protocols

"might be best viewed as a 'best practices' manual, rather than binding law)

(Callahan, J, concurring and dissenting).  Further, Defendant had failed to point to

any constitutional deficiencies in the warrant, aside from Defendant's reading of

CDT.  (See Mot. at 22-23.)

For the reasons stated above, the Court finds that CTD does not

require suppression of evidence obtained from Defendant's computer and

peripheral devices pursuant to search warrant.  Accordingly, the Court DENIES

Defendant's motion to suppress such evidence.

---

[15](...continued)
reasonable reliance' on the subsequently invalidated search warrant." Herring, 129
S. Ct. at 701 (quoting Leon, 468 U.S. at 922).  In executing the computer search
warrant at issue here, the agents' reliance on the warrant certainly was "objectively
reasonable" and without any misconduct or culpability.  Therefore, suppression of
the evidence obtained would not further the ends of justice.  See id.

<u>CONCLUSION</u>

For the reasons stated above, the Court DENIES Defendant's Motion to Suppress Evidence and Statements. (Doc. # 52.)

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 24, 2010.



_____
David Alan Ezra
United States District Judge

<u>United States v. King</u>, CR. NO. 09-00207 DAE; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

64